# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

~~SEALED~~

UNITED STATES OF AMERICA and the STATE OF FLORIDA ex rel. EDDA CASANOVA, M.D., MARILOURDES PEREZ, and SARAI HERNANDEZ,

    **Plaintiffs,**

v.

COASTAL MENTAL HEALTH CENTER, INC., MICHAEL SCALETTA, TIMOTHY SCALETTA, GINA BALLARD, JENARO FERNANDEZ, M.D., and MICHAEL TRAINOR,

    **Defendants.**

**CASE NO.:** 6:14-CV-204-ORL 18DAB

**FILED UNDER SEAL**



## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

Co-Relators Edda Casanova, M.D., Marilourdes Perez, and Sarai Hernandez (collectively "Relators") by and through their counsel, hereby file this Verified Complaint and Demand for Jury Trial against Defendants Coastal Mental Health Center, Inc. ("Coastal"), Michael Scaletta, Timothy Scaletta, Gina Ballard, Jenaro Fernandez, M.D., and Michael Trainor (collectively "Defendants"), and allege as follows:

### NATURE OF ACTION

1.     Relators bring this action on behalf of the United States of America against Defendants for their violations of the federal False Claims Act ("federal FCA"), 31 U.S.C. § 3729, *et seq.*, and on behalf of the State of Florida for their violations of the Florida False Claims Act ("Florida FCA"), Fla. Stat. § 68.081, *et seq.*

1

2. Relators also bring this action to address Coastal's retaliation against Relators in violation of the whistleblower provision of the federal FCA, 31 U.S.C. § 3730(h).

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the claims arising under the federal FCA pursuant to 31 U.S.C. §§ 3732(a) and 3730(b), and 28 U.S.C. §§ 1345 and 1331. This Court has jurisdiction over the claims arising under the Florida FCA pursuant to 31 U.S.C. §§ 3732(b) and 1367.

3. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3729, *et seq.* and Fla. Stat. § 68.081, *et seq.*, and complained of herein, took place in this District.

## PARTIES

4. Relator Edda Casanova, M.D. is a licensed psychiatrist and a resident of Volusia County, Florida. Dr. Casanova has thirty-one years of experience in the medical field, including diagnosing and treating substance abuse patients. Dr. Casanova was employed by Coastal from November 2, 2010 until February 9, 2011.

5. Relator Marilourdes Perez is a licensed mental health counselor and a resident of Volusia County, Florida. Relator Perez has focused her practice on mental health counseling and behavioral analysis since 2001, receiving her Master's degree in 2007. Relator Perez was employed by Coastal from February 14, 2009 until October 2010, and from February 2011 until November 2011.

6. Relator Sarai Hernandez is a resident of Seminole County, Florida. Relator Hernandez was employed as a secretary at Coastal from August 2010 until June 2011 and was personally involved in scheduling patients and maintaining patient documentation.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

unSealed
~~SEALED~~

UNITED STATES OF AMERICA and the
STATE OF FLORIDA ex rel. EDDA
CASANOVA, M.D., MARILOURDES
PEREZ, and SARAI HERNANDEZ,

      **Plaintiffs,**

v.

COASTAL MENTAL HEALTH CENTER,
INC., MICHAEL SCALETTA, TIMOTHY
SCALETTA, GINA BALLARD, JENARO
FERNANDEZ, M.D., and MICHAEL
TRAINOR,

      **Defendants.**

CASE NO.: 6:14-CV-204-ORL 18DAB

**FILED UNDER SEAL**



## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

    Co-Relators Edda Casanova, M.D., Marilourdes Perez, and Sarai Hernandez (collectively "Relators") by and through their counsel, hereby file this Verified Complaint and Demand for Jury Trial against Defendants Coastal Mental Health Center, Inc. ("Coastal"), Michael Scaletta, Timothy Scaletta, Gina Ballard, Jenaro Fernandez, M.D., and Michael Trainor (collectively "Defendants"), and allege as follows:

### NATURE OF ACTION

    1.    Relators bring this action on behalf of the United States of America against Defendants for their violations of the federal False Claims Act ("federal FCA"), 31 U.S.C. § 3729, *et seq.*, and on behalf of the State of Florida for their violations of the Florida False Claims Act ("Florida FCA"), Fla. Stat. § 68.081, *et seq.*

2.      Relators also bring this action to address Coastal's retaliation against Relators in violation of the whistleblower provision of the federal FCA, 31 U.S.C. § 3730(h).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the claims arising under the federal FCA pursuant to 31 U.S.C. §§ 3732(a) and 3730(b), and 28 U.S.C. §§ 1345 and 1331. This Court has jurisdiction over the claims arising under the Florida FCA pursuant to 31 U.S.C. §§ 3732(b) and 1367.

3.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3729, *et seq.* and Fla. Stat. § 68.081, *et seq.*, and complained of herein, took place in this District.

## PARTIES

4.      Relator Edda Casanova, M.D. is a licensed psychiatrist and a resident of Volusia County, Florida. Dr. Casanova has thirty-one years of experience in the medical field, including diagnosing and treating substance abuse patients. Dr. Casanova was employed by Coastal from November 2, 2010 until February 9, 2011.

5.      Relator Marilourdes Perez is a licensed mental health counselor and a resident of Volusia County, Florida. Relator Perez has focused her practice on mental health counseling and behavioral analysis since 2001, receiving her Master's degree in 2007. Relator Perez was employed by Coastal from February 14, 2009 until October 2010, and from February 2011 until November 2011.

6.      Relator Sarai Hernandez is a resident of Seminole County, Florida. Relator Hernandez was employed as a secretary at Coastal from August 2010 until June 2011 and was personally involved in scheduling patients and maintaining patient documentation.

2

7.       Relators are original sources of this information to the United States and the State of Florida. Relators have direct and independent knowledge of the information on which the allegations are based and have voluntarily provided the information to the United States and the State of Florida before filing this action under the federal FCA and Florida FCA.

8.       Defendant Coastal Mental Health Center, Inc. ("Coastal") is a mental health facility providing community behavioral health services to Medicaid recipients. Coastal has nine clinics located in the Central Florida cities of Daytona Beach, Orange City, Palm Coast, Palm Bay, Orlando, Longwood, Rockledge, Leesburg and Kissimmee. During Relators' employment with Coastal, it had a clinic located in Deltona, Florida. That clinic has since been relocated to Orange City, Florida, which is adjacent to Deltona.

9.       Defendant Michael Scaletta is the owner and CEO of Coastal.

10.      Defendant Timothy Scaletta is the President of Coastal.

11.      Defendant Joan Scaletta is one of Coastal's Directors.

12.      Defendant Gina Ballard is one of Coastal's Directors.

13.      Defendant Jenaro Fernandez, M.D. is a licensed psychiatrist, who, upon information and belief, is currently practicing at 1401 Langham Terrace, Lake Mary, FL 32746. Dr. Fernandez was employed by Coastal during Relators' employment.

14.      Defendant Michael Trainor is a licensed clinical social worker who, upon information and belief, is currently employed by Coastal and by Rehab After Work of Florida, LLC.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

15.      As required by the federal FCA, 31 U.S.C. § 3730(b)(2), and the Florida FCA, Fla. Stat. § 68.83(3), Relators have provided to the Attorney General of the United States, the

United States Attorney for the Middle District of Florida, the Attorney General of the State of Florida, and the Chief Financial Officer of the State of Florida a statement of all material evidence and information related to the Complaint. The disclosure statement is supported by material evidence known to Relators at the time of their filing, establishing the existence of Defendants' false claims. The disclosure statement includes attorney-client communications and work product of Relators' attorneys and is submitted to the U.S. Attorney General, the United States Attorney, the Florida Attorney General, and the Florida CFO in their capacities as potential co-counsel in this litigation; therefore, the disclosure is confidential.

## THE MEDICAID PROGRAM

16.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

17.     At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.

18.     By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive

4

Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

19.     42 C.F.R. §§ 455 *et seq.*, expressly states that a provider must certify that he is in compliance with all federal and state statutes and regulations in order to receive payment from Medicaid.

20.     Pursuant to Fla. Admin. Code § 59G-4.050, all community behavioral health services providers enrolled in the Florida Medicaid program must be in compliance with the Florida Medicaid Community Behavioral Health Coverage and Limitations Handbook, and the Florida Medicaid Provider Reimbursement Handbook, CMS-1500, which is incorporated by reference in Rule 59G-4.001.

21.     Pursuant to Fla. Admin. Code § 59G-5.020, all Medicaid providers enrolled in the Florida Medicaid program and billing agents who submit claims to Florida Medicaid on behalf of an enrolled Medicaid provider must comply with the provisions of the Florida Medicaid Provider General Handbook.

22.     Pursuant to the Florida Medicaid Provider General Handbook, when presenting a claim for payment under the Medicaid program, a provider has an affirmative duty to supervise the provision of, and be responsible for, goods and services claimed to have been provided, to supervise and be responsible for preparation and submission of the claim, and to present a claim that is true and accurate and that is for goods and services that, *inter alia*, have actually been furnished to the recipient by the provider prior to submitting the claim; when required by federal or state law, the provider rendering the service is actively licensed or certified to provide the service; are Medicaid-covered goods or services that are medically necessary; are of a quality

comparable to those furnished to the general public by the provider's peers; and are provided in accord with applicable provisions of all Medicaid rules, regulations, handbooks, and policies and in accordance with federal, state and local law.

23.     At all times relevant to this Complaint, Medicaid constituted a significant source of gross patient revenue for Defendants.

## SPECIFIC ALLEGATIONS

24.     Coastal is owned and operated by the Scaletta family, Michael and Joan Scaletta and their son Timothy "T.J." Scaletta (collectively "the Scalettas") and their daughter Gina Ballard, none of whom are health care professionals.

25.     During Relators' employment, all of Coastal's patients were Medicaid recipients.

26.     Medicaid is a state-run program that provides access to health care for low-income families and individuals. Florida Medicaid is funded by both the federal and Florida Governments, approximately half of the funds coming from each source.

27.     Approximately once a month, the Scalettas and Ballard hold planning meetings at Coastal's corporate office to decide and set forth policies for the running of Coastal.

28.     Policies set forth during these meetings are then disseminated to all of the Coastal locations via RingCentral Fax, which is a cloud-based facsimile program that allows the user to send faxes from his or her computer to multiple locations.

*Overbilling Therapy Sessions*

29.     One of Coastal's primary services is providing therapy sessions for its patients. These therapy sessions are billed to Medicaid in "units." For therapy sessions, one "unit" equates to fifteen minutes. Medicaid will reimburse a maximum of four units per patient per day for therapy sessions.

30.     Coastal's billing policies are developed by the Scalettas and Ballard at their monthly corporate planning meetings.

31.     Coastal has a policy of billing Medicaid for the maximum four units for every therapy session, regardless of the time actually spent with the patients.

32.     Therapy sessions are booked for one hour on Coastal's LeonardoMD scheduling system. When patients arrive for their therapy sessions, they sign in at the front desk. At the end of the day, the clinic staff, including Relator Hernandez, faxes the sign-in sheet to Coastal's corporate office.

33.     The staff at the corporate office then bills Medicaid for four units for every patient that signed in for his or her session based on the hour scheduled. The corporate office staff only reviews the schedule and the sign-in sheet. Neither the patients' charts or information from the practitioners regarding the actual time spent with a patient are requested.

34.     In order to support its fraudulent billing, Coastal has a policy requiring all therapists, including licensed mental health counselors and licensed clinical social workers, to document that they spent four units with the patient for every therapy session, regardless of how much time was actually spent with a patient.

35.     This policy was developed by the Scalettas and Ballard at their monthly corporate planning meetings.

36.     The policy was memorialized in a memorandum that was faxed to all of the practitioners and posted in each clinic.

37.     In addition to the written policy, Relator Perez was verbally instructed several times by Ballard to document that she spent a full hour with each patient for every therapy

7

session, regardless of the actual length of the appointment, so that Coastal could bill four units for every session.

38.     On a regular basis several of the practitioners, including Michael Trainor, spend less than forty-five minutes with patients but, upon information and belief, Coastal bills Medicaid for four units pursuant to its policy.

39.     Upon information and belief, practitioners, including Trainor, falsely document in patient records that the practitioners spend more than forty-five minutes with patients when they do not in order to support billing Medicaid for four units.

40.     In addition, several practitioners, including Trainor, Lisa Krupa, and Lawrence Goldberg, double book appointments with pairs of siblings, spending thirty minutes with each sibling. However, instead of billing Medicaid for two units per sibling, upon information and belief, Coastal bills Medicaid for four units pursuant to its policy.

41.     For example, Goldberg had two standing appointments with sibling groups on Saturday mornings at the Deltona clinic. Relator Hernandez was involved with scheduling these appointments.

42.     At 8:00 A.M. every Saturday, Goldberg met with a brother and sister, and, upon information and belief, Coastal billed Medicaid for four units for each patient pursuant to its policy.

43.     At 11:00 A.M. every Saturday, Goldberg met with two brothers (f/k/u, last initial B), and, upon information and belief, Coastal billed Medicaid for four units for each patient pursuant to its policy.

44.     At a minimum, Goldberg had these standing appointments the entire time Relator Hernandez worked for Coastal, from August 2010 until June 2011.

8

45.    In order to legally comply with Coastal's directive to bill four units for every session, Relator Perez refused to see patients that were more than fifteen minutes late. Relator Perez's late policy upset Coastal's management, particularly T.J. Scaletta and Ballard.

46.    For example, in summer 2011, a female patient was thirty minutes late. Ballard came into Relator Perez's office and informed her that the patient had arrived. Relator Perez stated that, due to the patient's tardiness, she could not meet with the patient. Ballard became very upset and left Relator Perez's office.

47.    On other occasions, T.J. Scaletta admonished Relator Perez for her late policy.

48.    All of the practitioners face the same pressure to document four units for every therapy session.

49.    In early 2011, the Supervisor at Coastal's corporate office, Tina Dowdy, was at the Deltona office meeting with Relator Hernandez regarding administrative matters.

50.    Dowdy observed that Lisa Krupa, a licensed mental health counselor, had only spent twenty minutes with a patient (patient's initials are T.M.), and asked Krupa the reason. Krupa explained that the patient was not feeling well, to which Dowdy responded "you do know we bill for the full hour regardless, right?"

51.    Upon information and belief, on that occasion, Coastal billed Medicaid for four units when Krupa only spent twenty minutes with the patient.

52.    On a Tuesday morning in or around March 2011, Tamar Richardson, the Director of Corporate Operations for Coastal, called Relator Hernandez to inquire about a patient that had been seen by Goldberg the previous Saturday.

53.     Goldberg was the only practitioner working that Saturday and, in the absence of other patients, the office staff had noticed that Goldberg only spent twenty minutes with a patient that was scheduled for an hour.

54.     Richardson requested that Relator Hernandez confirm that Goldberg documented four units on the progress sheet. Relator Hernandez questioned Goldberg about the appointment, and he stated that he only documented two units on the progress sheet.

55.     When Relator Hernandez relayed this information to Richardson, she was annoyed and stated that she would inform Michael Scaletta.

56.     Upon information and belief, on that occasion, Coastal billed Medicaid for four units when Goldberg only spent twenty minutes with the patient.

*Upcoding Medication Management Sessions*

57.     Coastal fraudulently bills Medicaid for appointments with physicians when, in fact, the patients' appointments are with a Licensed Practical Nurse ("LPN"), a Registered Nurse ("RN"), or a non-practitioner, such as Michael or T.J. Scaletta, and no physician is present.

58.     The majority of Coastal's patients are on prescription medications, including stimulants such as Ritalin (methylphenidate) and Adderall (amphetamine), and Benzodiazepines, such as Xanax (alprazolam) and Valium (diazepam).

59.     Due to the fact that these medications are controlled substances, the prescribing physician must see the patients for medication management appointments on a regular basis.

60.     Medication management appointments include the evaluation of the need for medication; evaluation of clinical effectiveness and side effects of medication; engaging in medication education (including discussing risks, benefits and alternatives with the individual or other responsible persons); and prescribing psychiatric medications.

10

61.     Pursuant to the Florida Medicaid Community Behavioral Health Coverage and Limitations Handbook, medication management appointments, which are billed under HCPCS Procedure Code T1015 for $60.00 per event, must be provided, at a minimum, by a psychiatrist, other physician, physician assistant, or psychiatric ARNP.

62.     The medication management appointments are automatically scheduled at the end of a patient's appointment for four weeks after the previous appointment.

63.     Relator Hernandez's job duties included scheduling the medication management appointments.

64.     Prior to 2011, Relator Hernandez observed that at least half of the medication management appointments at Coastal were scheduled with and conducted by LPNs or RNs without a physician present.

65.     However, upon information and belief, Coastal falsely billed Medicaid for medication management sessions under Procedure Code T1015.

66.     This is such a prevalent practice that the LPNs and RNs have their own schedule of patients and their own examination rooms at each of the clinics.

67.     In early 2011, Michael Scaletta set forth a policy that all medication management appointments were to be scheduled with LPNs and RNs only.

68.     This policy was developed by the Scalettas and Ballard at their monthly corporate planning meetings.

69.     Since this policy was set forth, nearly all medication management appointments have been conducted by LPNs or RNs, but Coastal falsely bills Medicaid for these sessions under Procedure Code T1015.

11

70.     Relator Hernandez questioned Coastal's management about the legality of billing Medicaid for the appointments conducted by the LPNs and RNs, and indicated that she did not think it was legal.

71.     In an attempt to cover up its fraud, Coastal falsifies patient records to reflect that the patient met with a physician, rather than an LPN or RN, in order to support these billings.

72.     For example, at the end of each day, Dr. Fernandez would sign the progress notes written by Arleen l/n/u, who was either an LPN or an RN. Dr. Fernandez did not see the patients, but he signed the notes in order to support Coastal's fraudulent billing.

73.     Dr. Casanova refused to sign any LPN's or RN's progress notes as though she had seen the patient.

74.     Michael Scaletta uses Coastal's internal scheduling software, LeonardoMD, which he accesses remotely from the corporate office, to monitor the daily schedules.

75.     On occasion, the LPNs and RNs asked Relator Hernandez to schedule an appointment with a physician because the patient was having severe problems with the medication, and so Relator Hernandez would schedule the patient with a physician as requested.

76.     When Relator Hernandez scheduled medication management appointments with physicians, Michael Scaletta would call Relator Hernandez, question her about it, and admonish her for scheduling the appointment with a physician rather than an LPN or RN.

77.     Michael and T.J. Scaletta frequently conduct medication management appointments.

78.     During Relator Perez's employment from 2009 through 2010, Michael and T.J. Scaletta would conduct medication management appointments with patients on Wednesday evenings.

79. Neither Michael nor T.J. Scaletta is a licensed health care provider.

80. Additionally, if the Deltona clinic was ever running behind, either Michael or T.J. Scaletta would come over to the clinic to "fill in."

81. In early 2011, when Relator Hernandez was working at the Deltona clinic, Michael Scaletta noticed, via the LeonardoMD patient check-in system, that patients had been waiting a long time. He called and spoke to Relator Hernandez, who explained that they were short-staffed. Michael Scaletta came over to the clinic and began seeing patients himself.

82. Upon information and belief, Coastal falsely bills Medicaid for medication management appointments conducted by the Scalettas under Procedure Code T1015.

83. Upon information and belief, Coastal falsifies patient records to reflect that the patient met with a physician, rather than one of the Scalettas, in order to support these billings.

*Prescriptions Written by Unqualified Nurses*

84. During the medication management appointments, the LPNs and RNs at Coastal write prescriptions.

85. Ultimately, a physician signs the written prescriptions, but no physician ever examines these patients or reviews his or her medical records, instead relying entirely on the LPN's, RN's, or non-practitioner's judgment.

86. As these patients are insured by Medicaid, their prescriptions are ultimately billed to and paid by Medicaid.

87. Upon information and belief, other Medicaid patients are given prescriptions without any evaluation whatsoever.

88.     During Relator Hernandez's first week of training in August 2010, a patient came in and asked the receptionist, Nadia Rivera, for his prescription from Dr. Fernandez. Rivera stated "I'll have it for you by the end of the week."

89.     Relator Hernandez was concerned by this exchange and looked up the patient. There was no record of the patient ever having been examined by Dr. Fernandez or any other physician at Coastal.

90.     Upon information and belief, Dr. Fernandez signed this patient's prescription without seeing the patient, and the patient thereafter filled the prescription and billed it to Medicaid.

91.     In fall 2010, a patient came into the Deltona office and spoke with Relator Hernandez. The patient explained that he was unable to attend his appointment and asked that Relator Hernandez give him his prescription regardless. When Relator Hernandez refused, the patient requested to speak with the previous receptionist, Rivera, stating "she's been getting me the prescriptions for some time." Relator Hernandez explained that Rivera had moved to the corporate office and that she could not give him a prescription.

92.     After this encounter, Relator Hernandez looked up the patient's records. He had only had one appointment at Coastal with Dr. Fernandez.

93.     Upon information and belief, Dr. Fernandez signed this patient's prescriptions without seeing the patient, and the patient thereafter filled the prescriptions and billed it to Medicaid.

94.     On February 8, 2011, Dr. Casanova was working in the Daytona clinic when a family that normally went to the Palm Coast clinic came in. The mother requested that the prescriptions for her five children be refilled. One of the secretaries, Christine l/n/u, contacted

14

the Palm Coast clinic and requested the children's medical files, but the Palm Coast clinic was unable to provide them.

95.     Christine then approached Dr. Casanova and gave her a handwritten note containing the names and medications for the five children. Christine explained that the children's mother was waiting in the lobby and that she would like Dr. Casanova to write the prescriptions designated on the paper.

96.     Dr. Casanova requested the children's medical histories, including the medication flow sheet and progress notes from the previous physician. Christine stated that she did not have that information available.

97.     Dr. Casanova explained to Christine that she could not write prescriptions for any medication, let alone for the Schedule II stimulants requested, based on a note containing only their names and medications. Christine asked Dr. Casanova to explain that to the mother waiting in the lobby, which she did.

98.     Later that day, Michael Scaletta called Dr. Casanova and admonished her for refusing to write the prescriptions. Dr. Casanova explained that she could not ethically or legally do so without at least reviewing the patients' medical information.

99.     Michael Scaletta responded something to the effect of "You don't understand, this is a clinic and we do what is needed to be done" before abruptly hanging up.

100.    The next day, Michael and T.J. Scaletta terminated Dr. Casanova's employment.

*False Diagnoses Used to get Paid by Medicaid*

101.    Even when patients are seen by the appropriate practitioners, their treatment is compromised because Coastal requires its practitioners to limit their diagnoses to those that are reimbursable by Medicaid, regardless of the impact on the patient.

102. The list of acceptable diagnoses was developed by the Scalettas and Ballard at their monthly corporate planning meetings.

103. Coastal circulates to its staff and practitioners a list of the Medicaid-reimbursable diagnoses via its RingCentral fax system.

104. At the end of each day, along with the sign-in sheets, the clinic staff provides the corporate office staff the applicable diagnoses of each patient that had an appointment with one of the physicians that day.

105. The office staff reviews each diagnosis to ensure it is on Coastal's permitted diagnoses list.

106. If a practitioner diagnoses a patient with something that is not on the list, the corporate office staff sends an email to the clinic office staff informing them that the diagnosis is not one that can be billed to Medicaid, suggesting an alternate diagnosis, and requesting that the physician change his or her diagnosis to one that can be billed to Medicaid.

107. During her employment, Relator Hernandez regularly received these emails.

108. At Coastal, the most frequently used diagnoses for adults include generalized anxiety disorder, depressive disorder, and bipolar I disorders.

109. At Coastal, the most frequently used diagnoses for children include attention deficit disorder, oppositional defiant disorder, conduct disorders, and adjustment disorders.

110. Autistic disorder is not reimbursable by Medicaid.

111. Because of this, in her entire tenure with Coastal, not one of Relator Perez's patients was issued a primary diagnosis of autistic disorder by a Coastal practitioner.

112. Relator Perez did, however, see several patients that exhibited behavioral problems commonly associated with autistic disorder and refused to limit their treatment due to

the fraudulent diagnoses. Relator Perez referred those patients to other facilities that provided appropriate services.

113.    When he discovered that Relator Perez was referring potentially autistic patients to other facilities, T.J. Scaletta reprimanded Relator Perez for doing so, indicating that she needed to keep all of Coastal's patients at Coastal.

114.    Practitioners at Coastal regularly accede to Coastal's pressure and change their diagnoses to one that is reimbursable.

115.    In or around spring 2011, Relator Hernandez was working at the Daytona Beach clinic and witnessed Dr. Fernandez change a diagnosis to one that could be billed to Medicaid. The secretary, Yvette l/n/u, received notification from the corporate office that a diagnosis given by Dr. Fernandez was not on the permitted diagnoses list. Yvette explained to Dr. Fernandez that Coastal could not charge Medicaid for the diagnosis that he had given. Yvette then requested that Dr. Fernandez change his diagnosis to the one suggested by the corporate office. Dr. Fernandez complied without argument.

116.    In November 2010, Coastal attempted to force Dr. Casanova to change her diagnosis because it could not be billed to Medicaid.

117.    During a November 2010 appointment, the patient requested a prescription for Xanax, disclosed that he was "high" on cocaine at the time, admitted to taking ten milligrams of Xanax every day, and stated that he often accepted Xanax as a form of payment in his business. Based on her more than two decades of experience treating substance abuse patients, Dr. Casanova declined to prescribe the patient Xanax and, instead, diagnosed him with "polysubstance abuse/dependence."

17

118.    Later that day, Yvette explained to Dr. Casanova that she had received notification from the corporate office that the diagnosis could not be billed to Medicaid. Yvette requested that Dr. Casanova change her diagnosis to one on the permitted diagnoses list.

119.    Dr. Casanova refused to change the patient's diagnosis.

120.    Yvette requested that Dr. Casanova contact Ballard because she had instructed Yvette to make sure the practitioners used only the diagnoses on Coastal's list.

121.    Dr. Casanova called Ballard and left her a voicemail.

122.    T.J. Scaletta returned Dr. Casanova's call and berated her for refusing to change her diagnosis.

**COUNT I**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**
**(Against All Defendants)**

123.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 122 by reference.

124.    Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, presented, or caused to be presented, false or fraudulent claims for payment or approval to the federal Government.

125.    As a result of Defendants' fraudulent actions, the United States has suffered damages.

126.    Relators have retained counsel to represent them in this matter and have incurred, and will continue to incur, attorneys' fees and costs.

**DEMAND FOR RELIEF**

WHEREFORE, Relators demand judgment against Defendants for:

(a)    Actual damages;

18

(b)      Treble damages;

(c)      Civil penalties of $11,000.00 per false claim that Defendants presented, or caused to be presented, to the federal Government;

(d)      Pre- and post-judgment interest;

(e)      Attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pursuing this case;

(f)      Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)      That Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(h)      Any other such relief as this Court deems just and proper.

## COUNT II
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)
## (Against All Defendants)

127.     Relators hereby incorporate the allegations set forth in paragraphs 1 through 122 by reference.

128.     Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, made, used, or caused to be made or used, false records and statements that were material to false or fraudulent claims submitted to the federal Government.

129.     As a result of Defendants' fraudulent actions, the United States has suffered damages.

130.     Relators have retained counsel to represent them in this matter and have incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Relators demand judgment against Defendants for:

(a)      Actual damages;

(b)     Treble damages;

(c)     Civil penalties of $11,000.00 per false record or statement material to a false or fraudulent claim made by, or caused to be made by, Defendants;

(d)     Pre- and post-judgment interest;

(e)     Attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pursuing this case;

(f)     Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)     That Relators be awarded the maximum amount allowed to them pursuant to the federal FCA; and

(h)     Any other such relief as this Court deems just and proper.

## COUNT III
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)
## (Against Coastal, the Scalettas, and Ballard)

131.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 122 by reference.

132.    Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).

133.    Relators have retained counsel to represent them in this matter and have incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants for:

(a)     Actual damages;

(b)     Treble damages;

(c)     Civil penalties of $11,000.00 per false claim that Defendants conspired to present, or cause to be presented, to the federal Government;

(d)     Civil penalties of $11,000.00 per false record or statement material to a false or fraudulent claim that Defendants conspired to make, or to cause to be made;

(e)     Pre- and post-judgment interest;

(f)     Attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pursuing this case;

(g)     Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(h)     That Relators be awarded the maximum amount allowed to her pursuant to the federal FCA; and

(i)     Any other such relief as this Court deems just and proper.

## COUNT IV
## VIOLATION OF Fla. Stat. § 68.082(2)(a)
## (Against All Defendants)

134.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 122 by reference.

135.    Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, presented, or caused to be presented, false claims for payment or approval.

136.    As a result of Defendants' fraudulent actions, the State of Florida has suffered damages.

137.    Relators have retained counsel to represent them in this matter and have incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants' for:

(a)     Actual damages;

(b)     Treble damages;

(c)     Civil penalties of $11,000.00 per false claim that Defendants presented or caused to be presented;

(d)     Pre- and post-judgment interest;

(e)     Attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pursuing this case;

(f)     Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)     That Relators be awarded the maximum amount allowed to them pursuant to the Florida FCA; and

(h)     Any other such relief as this Court deems just and proper.

## COUNT V
## VIOLATION OF Fla. Stat. § 68.082(2)(b)
## (Against All Defendants)

138.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 122 by reference.

139.    Defendants knowingly, or in reckless disregard or deliberate ignorance of the falsity of the information involved, made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim.

140.    As a result of Defendants' fraudulent actions, the State of Florida has suffered damages.

141.    Relators have retained counsel to represent them in this matter and have incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants' for:

(a)     Actual damages;

(b)     Treble damages;

(c)     Civil penalties of $11,000.00 per false record or statement material to a false or fraudulent claim made by, or caused to be made by, Defendants;

(e)     Pre- and post-judgment interest;

(f)     Attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pursuing this case;

(g)     Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(h)     That Relators be awarded the maximum amount allowed to them pursuant to the Florida FCA; and

(i)     Any other such relief as this Court deems just and proper.

## COUNT VI
## VIOLATION OF Fla. Stat. § 68.082(2)(c)
## (Against Coastal, the Scalettas, and Ballard)

142.    Relators hereby incorporate the allegations set forth in paragraphs 1 through 122 by reference.

143.    Defendants conspired to commit violations of Fla. Stat. § 68.082(2).

144.    Defendants committed overt acts, as set forth above, in furtherance of that conspiracy, causing damage to the State of Florida.

145.    Relators have retained counsel to represent them in this matter and have incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants for:

(a)     Actual damages;

(b)     Treble damages;

(c)     Civil penalties of $11,000.00 per conspiracy;

(d)     Pre- and post-judgment interest;

(e)     Attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pursuing this case;

(f)     Permanent injunctive relief to prevent any recurrence of the false claims for which redress is sought in this Complaint;

(g)     That Relators be awarded the maximum amount allowed to them pursuant to the Florida FCA; and

(h)     Any other such relief as this Court deems just and proper.

## COUNT VII
## RETALIATION AGAINST DR. CASANOVA
## IN VIOLATION OF 31 U.S.C. § 3730(h)
## (Against Coastal)

146.     Dr. Casanova hereby incorporates the allegations set forth in paragraphs 1 through 122 by reference.

147.     During the course of her employment with Coastal, Dr. Casanova learned that Coastal was defrauding, and conspiring to defraud, the federal Government in violation of the federal FCA.

148.     Dr. Casanova objected to Coastal's violations of the federal FCA and refused to participate in Coastal's fraudulent schemes in an effort to stop the violations.

149.     Dr. Casanova's efforts to stop Coastal's violations of the federal FCA include, but are not limited to, her refusal to illegally prescribe medications to Medicaid recipients as set forth in paragraphs 94 through 100, and her refusal to sign LPNs' and RNs' progress notes as set forth in paragraphs 71 through 73.

150.     Dr. Casanova's efforts to stop Coastal's violations of the federal FCA also include, but are not limited to, her refusal to change or limit her diagnoses to those that were reimbursable by Medicaid, as set forth in paragraphs 116 through 122.

151.    When refusing to participate in Coastal's violations of the federal FCA, and in an effort to stop additional violations, Dr. Casanova objected to Coastal charging Medicaid for its illegal practices.

152.    In retaliation for her efforts to stop Coastal's fraud, including her objections to and refusal to participate in the fraud, Coastal terminated Dr. Casanova's employment.

153.    As a direct and proximate result of this unlawful retaliation, Dr. Casanova has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with her efforts to obtain alternative employment in an amount to be proven at trial.

154.    Dr. Casanova has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Dr. Casanova demands judgment against Coastal for:

(a)    Two times her backpay;

(b)    Compensatory damages;

(c)    Pre- and post-judgment interest;

(d)    Reinstatement in her previous position at Coastal;

(e)    Attorneys' fees, costs, and expenses which Dr. Casanova necessarily incurred in bringing and pursuing this case; and

(f)    Any other such relief as this Court deems just and proper.

## COUNT VIII
## RETALIATION AGAINST RELATOR PEREZ
## IN VIOLATION OF 31 U.S.C. § 3730(h)
### (Against Coastal)

155.    Relator Perez hereby incorporates the allegations set forth in paragraphs 1 through 122 by reference.

156.    During the course of her employment with Coastal, Relator Perez learned that Coastal was defrauding, and conspiring to defraud, the federal Government in violation of the federal FCA.

157.    Relator Perez objected to Coastal's violations of the federal FCA and refused to participate in Coastal's fraudulent schemes in an effort to stop the violations.

158.    Relator Perez's efforts to stop Coastal's violations of the federal FCA include, but are not limited to, her refusal to document that she spent four units with a patient when she did not to support Coastal's fraudulent billing to Medicaid, as set forth in paragraphs 45 through 47, and her complaints to Coastal's management that doing so was illegal.

159.    Relator Perez's efforts to stop Coastal's violations of the federal FCA also include, but are not limited to, her refusal to limit treatment of patients based on the fraudulent diagnoses given to those patients because they could be billed to Medicaid as set forth in paragraphs 101 and 110 through 113.

160.    In retaliation for her efforts to stop Coastal's fraud, including her objections to and refusal to participate in the fraud, Coastal terminated Relator Perez's employment.

161.    As a direct and proximate result of this unlawful retaliation, Relator Perez has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with her efforts to obtain alternative employment in an amount to be proven at trial.

162.     Relator Perez has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## **DEMAND FOR RELIEF**

WHEREFORE, Relator Perez demands judgment against Defendants for:

(a)     Two times her backpay;

(b)     Compensatory damages;

(c)     Pre- and post-judgment interest;

(d)     Reinstatement in her previous position at Coastal;

(e)     Attorneys' fees, costs, and expenses which Relator Perez necessarily incurred in bringing and pursuing this case; and

(f)     Any other such relief as this Court deems just and proper.

## **COUNT IX**
## **RETALIATION AGAINST RELATOR HERNANDEZ**
## **IN VIOLATION OF 31 U.S.C. § 3730(h)**
## **(Against Coastal)**

163.     Relator Hernandez hereby incorporates the allegations set forth in paragraphs 1 through 122 by reference.

164.     During the course of her employment with Coastal, Relator Hernandez learned that Coastal was defrauding, and conspiring to defraud, the federal Government in violation of the federal FCA.

165.     Relator Hernandez objected to Coastal's violations of the federal FCA and refused to participate in Coastal's fraudulent schemes in an effort to stop the violations.

166.     Relator Hernandez's efforts to stop Coastal's violations of the federal FCA also include, but are not limited to, her complaints to Coastal's management that allowing LPNs,

RNs, and non-practitioners to conduct medication management appointments and write prescriptions, as set forth in paragraphs 57 through 70, was illegal and fraudulent.

167. In retaliation for her efforts to stop Coastal's fraud, including her objections to and refusal to participate in the fraud, Coastal terminated Relator Hernandez's employment.

168. As a direct and proximate result of this unlawful retaliation, Relator Hernandez has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with her efforts to obtain alternative employment in an amount to be proven at trial.

169. Relator Hernandez has retained counsel to represent her in this matter and has incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Relator Hernandez demands judgment against Coastal for:

(a)     Two times her backpay;

(b)     Compensatory damages;

(c)     Pre- and post-judgment interest;

(d)     Reinstatement in her previous position at Coastal;

(e)     Attorneys' fees, costs, and expenses which Dr. Casanova necessarily incurred in bringing and pursuing this case; and

(f)     Any other such relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relators hereby respectfully demand trial by jury on all issues and counts triable of right before a jury.

Dated: February 7, 2014

                    Respectfully submitted,

                    *Jill S. Schwartz*

Jill S. Schwartz, Attorney at Law
Florida Bar No. 523021
Alfred Truesdell, Esquire
Florida Bar No. 885363
Mollie Smith, Attorney at Law
Florida Bar No. 0085419
655 W. Morse Boulevard, Suite 212
Winter Park, Florida 32789-3745
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
jschwartz@schwartzlawfirm.net
atruesdell@schwartzlawfirm.net
msmith@schwartzlawfirm.net

Mike Bothwell, Attorney at Law
Georgia Bar No. 069920
Julie Bracker, Attorney at Law
Georgia Bar No. 073803
Jason Marcus, Attorney at Law
Georgia Bar No. 949698
Bothwell Bracker, P.C.
304 Macy Drive
Roswell, Georgia 30076
Telephone: (770) 643-1606
Facsimile: (770) 643-1442
Mike@whistleblowerlaw.com
Julie@whistleblowerlaw.com
Jason@whistleblowerlaw.com